IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 5, 2018

**STATE OF TENNESSEE v. WILLIAM INGRAM**

**Appeal from the Criminal Court for Shelby County**
**No. 15-05485        Lee V. Coffee, Judge**

_____

**No. W2017-02343-CCA-R3-CD**

_____

A Shelby County Criminal Court Jury convicted the Appellant, William Ingram, of aggravated assault, and the trial court sentenced him to six years in the Shelby County workhouse. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Laurie W. Hall (on appeal) and Juni Ganguli (at trial), Memphis, Tennessee, for the Appellant, William Ingram.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Leslie Fouche and Kevin McAlpin, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The Shelby County Grand Jury returned an indictment charging the Appellant with especially aggravated kidnapping of the victim, Kerry Soule; aggravated assault of the victim by inflicting serious bodily injury, and theft of more than $1,000 but less than $10,000 worth of the victim's property. The charges stemmed from an incident that occurred between the Appellant and the victim on the evening of August 15, 2015.

At trial, the victim testified that she had gone to high school with the Appellant, that he was two years older than she was, and that he graduated in 1979. The victim did not know the Appellant well in school, but they "reconnected . . . [a] few years ago, on Facebook," and began having an intimate relationship. The victim had considered the Appellant to be her boyfriend "[s]ometimes."

The victim said that around 4:00 or 5:00 p.m. on Saturday, August 15, 2015, the Appellant came to her house on Wade Street. They each had one alcoholic drink, talked for a while, and then had sex. Afterward, they went to Bubba's, a bar and grill on Stage Road in Bartlett for drinks. Bubba's was located approximately ten to fifteen minutes from the victim's house. The Appellant was drinking rum and Coke, and the victim was drinking some type of mixed drink.

During most of their time at Bubba's, they were getting along "fine," and the victim was "thrilled" to be with the Appellant. At some point, however, the Appellant noticed a woman in the bar and told the victim, "I'm pretty sure I've slept with that girl." The victim explained that the comment did not bother her because she did not feel possessive of the Appellant; instead, she "thought it was funny." The victim later encountered the woman in the bathroom, told her about the Appellant's comment, and they laughed. The woman left the bathroom before the victim. When the victim came out of the bathroom, she saw the woman yelling at the Appellant but did not hear what she was saying. The victim did not sit down at the Appellant's table until the woman left. Once the Appellant finished his second drink, he told the victim they were leaving and walked out of the bar. The victim, who had not finished her second drink, paid the bill and joined him on the bar's patio. The Appellant was angry because the woman in the bar had embarrassed him, and he began yelling at the victim. The victim left the patio and walked to her car, a 2005 Saturn Ion. The Appellant "went stomping off" in the parking lot in the opposite direction.

The victim got into her car "and went to get him." The victim explained that the Appellant had been away for a while, she had missed him, and she did not think a "petty" argument should prevent them from spending time together. When she got to the Appellant, she parked her car, got out, and told him, "Get in the car, and let's go home." The Appellant agreed, and the victim got in the passenger seat so the Appellant could drive. They left Bubba's around 6:00 or 6:30 p.m. They had been at the bar approximately one to one and one-half hours.

The victim said that before they got out of the parking lot, the Appellant began yelling at her and hit her four or five times in the face with a closed fist. When he stopped hitting her, she thought, "Okay, whatever." As they were driving from the parking lot, the Appellant then hit her again. The victim estimated that the Appellant hit

her a total of twelve or fifteen times. As he hit her, he yelled, "I'm going to kill you." She believed his threats.

After the beating ended, the victim "laid down sideways in the seat to get out of reach of his fist." She did not feel free to leave, and she did not try to escape because the road was busy and jumping out of the car was "imprudent."

After driving for ten or fifteen minutes, the Appellant parked the car. The victim noticed they were at a house that belonged to the Appellant's father; however, she did not think anyone was living at the house. When the car stopped moving, the victim ran to the next-door neighbor's house, beat on the front door, and yelled for help, but no one answered the door. The victim was terrified the Appellant was going to kill her.

The Appellant walked up behind her, grabbed her hair, threw her on the ground, and began dragging her across the neighbor's yard toward his father's house. A neighbor who lived up the street stepped outside to smoke, saw what was happening, and yelled that he was going to call the police. The Appellant dropped the victim, ran to the victim's car, and drove away. The neighbor stayed with the victim until the police arrived. The victim estimated that her car was worth $5,000.

Upon arriving at the scene, the police called an ambulance, which transported the victim to Methodist North Hospital. Thereafter, she was airlifted to Methodist University Hospital in order to see a neurosurgeon. The victim had "a subdural hematoma, which is bleeding on [the] brain" and bruises and swelling on the left side of her face. Although the majority of the victim's injuries were to her head, she had some minor injuries on her arms that she did not notice until sometime later. She spent three days in the intensive care unit (ICU) of the hospital and one day in a "regular" room before being released.

The victim said that while the Appellant was in jail, she wrote a letter to him, and he wrote her a letter in response. In his letter, the Appellant discussed the incident, acknowledging that they had an argument. He told the victim:

> And then you get your ass knocked off, backhanded, three or four times straight to the left side of your misshapen head. You deserve to have your teeth knocked down your throat. Then I go off. What the f[*]ck did you expect? Did you get the attention you wanted? And I told you I'd kill your dad. As a matter of fact, I said I'd kill your mom, again, your friends, your cats, and I'd burn your mother-f[*]cking house to the ground.

The victim agreed that the Appellant's letter accurately described the events of the evening, with the exception that the Appellant struck her with a closed fist.

Vance Culver, a firefighter and emergency medical technician, testified that he lived on Gailyn Drive, which he estimated was a five- to seven-minute drive from Bubba's. In the early evening of August 15, 2015, Culver was sitting on the tailgate of his truck outside his house to cool off after finishing some yard work. He saw a red car stop at the house located at 3800 Gailyn Drive. The house was being remodeled, and Culver thought it was unoccupied. Culver explained that his house was "four houses up the hill into the cove" from that location.

The Appellant got out of the driver's side of the red car, and the victim got out of the passenger's side. The Appellant walked to the keypad on the garage door of the house. Meanwhile, the victim went to the house next door and began banging on the door so hard that Culver could hear it. The Appellant, who had not opened the garage door, approached the victim. Culver lost sight of the Appellant when the Appellant walked into the entryway of the next-door neighbor's house where the victim was banging on the door. Approximately five seconds later, the Appellant emerged from the entryway dragging the victim across the yard by her hair. Culver hollered, "Hey!" The Appellant released the victim and drove away in the red car. Culver estimated that the entire incident lasted thirty to sixty seconds.

Culver called the Bartlett Police Department as he walked down the hill toward the victim. The victim seemed to be shocked, dazed, confused, and disoriented. Her face was bruised, beaten, bloody, and swollen. The police dispatcher asked Culver to stay with the victim until the police arrived, and he agreed. The police arrived approximately two minutes later, and Culver gave his statement then returned home.

Culver stated that he had seen the Appellant visit that residence on prior occasions. Culver thought the residence was "a flop house" because the group of young people who had lived there had "people in and out all the time." Culver had never seen the victim before.

On cross-examination, Culver clarified that 3800 Gailyn Drive was the third house from his and that the victim ran to the fourth house. When Culver first saw the victim walking away from the car, he speculated that she and the Appellant were retrieving the mail. He realized he was wrong when she went next door and banged on the door. Culver did not hear any conversation between the victim and the Appellant.

Bartlett Police Officer Casey Knight testified that he and a trainee were dispatched to the scene because of a call reporting "a female in distress that had been involved in a domestic with her significant other." Upon arriving at the scene, Officer Knight saw that

the victim was "very upset and in pain" and that she had obvious injuries to her face. Officer Knight was able to speak with the victim briefly before an ambulance transported her to the hospital.

Later that night, Officer Knight spoke with the victim at the hospital. He spoke with her again the next day. He took photographs of her injuries on both occasions. The photographs were admitted as exhibits.

On cross-examination, Officer Knight said that at the scene, the victim was shaken by what happened but was not completely disoriented.

Officer Quentin Crowley testified that at 11:05 a.m. on August 16, 2015, the police found the victim's red Saturn Ion parked in front of the house that "backed up to the back of" 3800 Gailyn Drive.

Dr. Daniel Hoit, a neurosurgeon, testified that on August 15, 2015, he saw the victim at Methodist University Hospital. The consultation consisted of a face-to-face visit with the victim, a physical examination, and a review of the CAT scan of her head. The CAT scan revealed that the victim had a subdural hematoma, which was "essentially bleeding that's occurred between the brain and the skull." Dr. Hoit said that a subdural hematoma could have complications that mimic those of a stroke, such as seizures and weakness on one side of the body. He said that although subdural hematomas are not always life-threatening, "they can be fatal."

Dr. Hoit recommended that the victim be placed in ICU for observation because her situation was "dangerous." He explained that once brain bleeding started, it could continue and that "[a]s a subdural hematoma grows larger, that's when it can start to cause the problems." The victim might have required surgery if the bleeding had progressed.

On cross-examination, Dr. Hoit said that when he saw the victim, she was awake, her breathing was not labored, and she was not in acute distress. She opened her eyes "spontaneously," and "[t]he finger to nose was intact." Dr. Hoit asked the victim to name three objects, and she correctly performed the task. The victim complained of mild headaches but had no nausea, vomiting, blurry vision, numbness, weakness, or focal deficits. She was discharged from the hospital on August 18, 2015, and her "discharge diagnosis was that there was a traumatic subdural hematoma that was stable."

On redirect examination, Dr. Hoit said that a subdural hematoma was not "less dangerous" if the person appeared to be clear-headed. The victim was in ICU so that nurses could observe her closely for any neurological changes, which could happen

quickly. Dr. Hoit had been concerned about an expansion of the subdural hematoma, but it did not expand.

The State closed its case-in-chief. The Appellant did not testify or put on proof. The jury acquitted the Appellant of especially aggravated kidnapping and theft but found him guilty of aggravated assault, a Class C felony. The trial court sentenced the Appellant as a Range I, standard offender to six years in the workhouse. See Tenn. Code Ann. § 40-23-104(a).

On appeal, the Appellant challenges the sufficiency of the evidence sustaining his aggravated assault conviction.

## II. Analysis

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Aggravated assault as charged in the indictment occurs when a person intentionally or knowingly commits an assault and causes serious bodily injury to another. Tenn. Code Ann. § 39-13-102(a)(1)(A)(i). A person commits assault when the person "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily

injury." Tenn. Code Ann. § 39-13-101(a)(2). Serious bodily injury is defined as a bodily injury that involves:

> (A) A substantial risk of death;
>
> (B) Protracted unconsciousness;
>
> (C) Extreme physical pain;
>
> (D) Protracted or obvious disfigurement;
>
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or
>
> (F) A broken bone of a child who is twelve (12) years of age or less[.]

Tenn. Code Ann. § 39-11-106(a)(34); see also State v. Farmer, 380 S.W.3d 96, 101-02 (Tenn. 2012).

At trial, the proof revealed that during the drive from a bar after an embarrassing scene, the Appellant repeatedly struck the victim in the head with a closed fist and threatened to kill her. He drove her to an unoccupied house owned by his father. She ran to the next-door neighbor's house in search of help, and the Appellant pursued her. He was dragging her by her hair when Culver saw the incident and yelled at the Appellant. The Appellant dropped the victim and drove away in her car. The victim was later taken to the hospital where she was diagnosed with a subdural hematoma. She spent three days in the ICU and one day in a "regular" room before being released.

On appeal, the Appellant's sole contention is that the State failed to prove the victim suffered serious bodily injury as charged in the indictment. This court has explained that "[w]hile the phrase 'serious bodily injury,' an essential element of the offense of aggravated assault, is not susceptible to precise legal definition, it must describe an injury of a greater and more serious character than that involved in a simple assault." State v. Barnes, 954 S.W.2d 760, 765 (Tenn. Crim. App. 1997). "The distinction between 'bodily injury' and 'serious bodily injury' is generally a question of fact for the jury and not one of law." Id. at 765-66.

The Appellant contends that the evidence did not show that the victim suffered protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Tenn. Code Ann. § 39-11-106(a)(34)(B)-(E). He contends, therefore,

that in order to establish the victim suffered serious bodily injury, the State needed to prove that the victim's injuries carried a "substantial risk of death" but that it failed to adduce sufficient proof of that factor. Tenn. Code Ann. § 39-11-106(a)(34)(A). The State responds that it proved aggravated assault by establishing the victim suffered extreme physical pain and that her injuries carried a substantial risk of death.

In its closing argument at trial, the State argued that the victim "testified that she had extreme physical pain." Our examination of the record reveals that the State never asked the victim whether her injuries were extremely painful, and the victim never asserted that she suffered extreme physical pain. On appeal, the State acknowledges that "the victim never specifically used the[] words [extreme physical pain] in her testimony." However, citing the victim's testimony, the testimony of other witnesses, and the photographs of the victim's injuries, the State maintains that "there was proof from which the jury could reasonably infer that the victim suffered extreme physical pain."

In State v. Sims, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995), this court examined how to define "serious bodily injury" in connection with the especially aggravated robbery, aggravated assault, especially aggravated burglary, and especially aggravated kidnapping statutes. This court determined:

> The *ejusdem generis* canon of statutory construction is helpful when construing the enumerated definition of "serious bodily injury." According to the Sixth Edition of Black's Law Dictionary, *ejusdem generis* means when words follow an enumeration of classes of things the words should be construed to apply to things of the same general class as those enumerated.

Id. In other words, this court found that the pain associated with the injury or injuries at issue should be "extreme enough to be in the same class as an injury which involves a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss or impairment of the use of a bodily member, organ or mental faculty." Id. This court concluded that pain commonly associated with the injury suffered by the victim in Sims, a broken nose, would not constitute extreme physical pain. Id. Regardless, this court acknowledged "the difficulty of quantifying or measuring pain." Id. Later, this court stated "that the subjective nature of pain is a question of fact to be determined by the trier of fact, in this case the jury." State v. Eric A. Dedmon, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. at Nashville, Feb. 23, 2006).

In State v. Farmer, 380 S.W.3d 96, 101 (Tenn. 2012), our supreme court examined whether a victim's injury could be considered serious bodily injury. The proof at trial

revealed that during a robbery, one of the defendants shot the victim in the leg. Id. at 98. The victim did not notice the injury until he saw a hole in his pants. Id. at 99, 101. Our supreme court stated that the proof adduced at trial did not support a finding that the victim's "injury involved a degree of pain that would warrant its inclusion among the other enumerated portions of the definition of 'serious bodily injury.'" Id. at 101. The court noted that the victim "testified that he experienced pain after realizing he had been shot," however, his "hospital records do not classify his pain as 'extreme' but rather as 'mild' to 'moderate.'" Id. The court further noted that the victim "was given a prescription for pain medication before leaving the hospital, but he never testified as to the degree of pain he experienced." Id. (footnote omitted). Our supreme court concluded that the jury "could not reasonably infer from [the victim's] testimony, the hospital records, and the nature of his injury that [his] wound involved extreme pain." Id. at 101-02.

In the instant case, the State adduced proof that the Appellant punched the victim in the head multiple times with his closed fist, and he dragged her by her hair across a yard. An officer that responded to the call testified that the victim had obvious injuries to her face and that she was "very upset and in pain." A doctor testified about the victim's subdural hematoma but did not testify about whether pain was associated with that injury. The State submitted no medical records as exhibits, but admitted two photographs to show the victim's injuries, which show extensive bruising to the victim's face and eyes. The State did not elicit any specific testimony regarding the degree of pain the victim suffered.

Regardless, we conclude that the evidence shows that the victim's injuries carried a substantial risk of death. We note that in Farmer, 380 S.W.3d at 102, our supreme court stated that on appeal, this court held that the bullet could have "'punctured or severed the victim's femoral artery or vein, causing the victim to bleed to death'" and that failing to do so was "'a serendipitous turn of events for the victim, not the defendants.'" Id. at 102 (quoting State v. Michael Farmer, Nos. W2009-02281-CCA-R3-CD, W2009-02283-CCA-R3-CD, 2011 WL 2672008, at *5 (Tenn. Crim. App. at Jackson, July 8, 2011)). However, our supreme court disagreed with this court's analysis, holding "that in determining whether there was a 'serious bodily injury' based on a 'substantial risk of death,' we must look to the injury that occurred rather than the injury that *could* have occurred or the manner in which it occurred." Id. Our supreme court, upon observing that the State failed to "introduce any expert testimony that [the victim's] injury involved a substantial risk of death," held that the victim's injury did not rise to the level of serious bodily injury. Id.

The Appellant argues that although Dr. Hoit was concerned that the subdural hematoma could grow larger, the proof at trial revealed that the victim's condition never developed into anything life-threatening. The State responds that Dr. Hoit's testimony

that the victim's subdural hematoma was dangerous and life-threatening was sufficient to establish the victim suffered serious bodily injury. We agree with the State.

Our supreme court has explained that "[b]ecause in many cases a layperson does not have the necessary medical knowledge to determine whether a particular injury involves a substantial risk of death, expert medical testimony is frequently of critical importance in establishing that fact." Id.; Victor Martin, No. W2017-01610-CCA-R3CD, 2018 WL 4677575, at *11. In the instant case, Dr. Hoit testified that the victim's subdural hematoma, or brain bleed, was life-threatening and that, if it grew, it had the potential to become even more dangerous. Accordingly, he recommended that the victim be placed in ICU for close observation so medical staff could respond quickly in the event her condition deteriorated. We conclude that this proof was sufficient to establish serious bodily injury to sustain the Appellant's conviction of aggravated assault. See State v. Martavious D. Brooks, No. M2017-00505-CCA-R3-CD, 2018 WL 3108882, at *13 (Tenn. Crim. App. at Nashville, June 25, 2018), perm. to appeal denied, (Tenn. Oct. 10, 2018); State v. Christopher Earl Watts, No. M2009-02570-CCA-R3-CD, 2012 WL 1591730, at *18 (Tenn. Crim. App. at Nashville, May 3, 2012).

### III.  Conclusion

The judgment of the trial court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE